509 P.2d 367

Merlin L. ANDREW et al., Plaintiffs
and Appellants,

v.

IDEAL NATIONAL INSURANCE COM-
PANY, Defendant and Respondent.

Joyce Cordner OLPIN and LeRoy M. Rich-
man, for themselves and for and on behalf
of all other persons similarly situated,
Plaintiffs and Appellants,

v.

IDEAL NATIONAL INSURANCE COMPA-
NY et al., Defendants and Respondents.

Nos. 13040 and 13166.

Supreme Court of Utah.

April 24, 1973.

Lon Rodney Kump, Parker M. Nielson, Joel M. Allred, Glen M. Richman, Salt Lake City, for plaintiffs and appellants.

John S. Boyden, David K. Watkiss, Salt Lake City, for defendants and respondents.

HENRIOD, Justice:

Appeal from a summary judgment dismissing plaintiffs' class action with respect to rights under a Bonus Fund endorsement on a life insurance policy. Reversed, with costs to plaintiffs.

In 1960, about 12 years after issuance of the policies subject of this litigation, the defendant merged with another company, acquiring its assets and assuming its liabilities under policies it had written, including those considered here, which were written in 1948 and 1949. Such policies had a single annual premium covering life insurance coverage and a savings feature,—the Bonus Fund,—where the insurer agreed to deposit at least $1.00 into the Bonus Fund for every $1,000 of insurance written over a 20-year period, to be divided among those who were current in their premium payments during such period. The number of policies to be sold was limited. The policies sold were delivered to the purchasers along with a letter of cheer, congratulating the lucky purchasers for having made "a sound and wise decision." In March 1948, shortly after having bought a policy, the plaintiff Andrew, after contacting the Utah Insurance Commissioner, received a letter from the latter stating that the company was "sound financially in every respect," that the policy had been approved and that it was "a special policy granted this company to get them established" and that "all the older companies have had the same privilege."

Under the policy's terms by December 31, 1951, the Bonus had accumulated $6,930. Not long after, and after defendants' paid actuary rendered an opinion, the company "re-calculated" the Fund for some reason other than that stated in its solicited insurance policy, so that in 1954 the Fund dwindled to $2,416 by some different kind of calculation, ostensibly on account of some sort of illegality which never was reported to the policyholders,—nor was the shrinkage of the Fund,—until the 20th and maturity year of the Fund, when the company, after having collected full premiums for 20 years, bombshelled its policyholders with an arbitrary letter declaring the Bonus Fund endorsement void, *based on an Attorney General's* opinion. The policyholders were offered four options for settlement of this *alleged* void policy, which options were the brain children of the defendant insurer,—which the

moving litigants here rejected,—and right-ly so on such a self-serving, unilateral basis, bottomed on opinions of its own employees and the Attorney General, neither of which is dispositive. The options were given (which seems to make little sense if defendant asserts and re-asserts that the contract was void),—without any alternative but to accept one of the four,—an alternative created and dispatched to the policyholders after a unilateral, self-serving decision made by one party to a contract to interpret and determine the terms thereof, —which it not only presumed to construe but concedes it created. This is a good, economic business practice, if possible and enforceable.

It might be urged that the company may be impaled on the horns of its own dilemma by its claim that the language of the endorsement creates a purported contract that is null and void, but by virtue of which such language it concedes sufficiently is valid to prompt a compromise or settlement of legitimate claims. If the contract is void, it is void. Defendants seem to say that this being so, however, plaintiffs cannot enforce it, but defendants can modify it by asserting unenforceability on their own urged statutory violation, subjecting them to a penalty and possible suspension of their license for issuing a void contract.[1]

It is axiomatic that he who seeks equity must do it. Hardly can the defendant insurer here conform by attempting to assume a dual role of litigant savior and benevolent Chancellor,—and at once reserve a conscionable expectation of judicial approval. It is difficult to concede the equities lie only with defendants and their predecessors who sought out Andrew, not he them. The facts of this case do not lead us to agree with Ideal's asserted defense that "special penalties imposed on the insurer would in no way excuse, mitigate or condone the unlawful act of the insured (Andrew)."

First, it assumes something not in the record: That Andrew approached the company to get it to sell him a policy; second, that the company consistently can say that, after it illegally sold to Andrew, the latter became particeps to such illegality, although the company, but not he, could be punished under the statute.

Defendants' brief largely is devoted to self-serving reports of employed actuaries and some insurance commissioners (who tended to agree with such reports), without bothering to consult anyone representing the policyholders. For example, to illustrate the indifference to insureds' interest, the Commissioner who heard and granted the merger petition in 1960 said nothing in his findings or conclusions anent any sug-

---

1. Chap. 63, Laws of Utah 1947, 43-27-1, p. 273.

gestion of illegality in the Bonus Fund endorsement, saying only that the merger agreement was "fair and equitable to the policyholders and stockholders of the companies,"—while ironically, ten years later in an affidavit prompted by defendants, saying that the "endorsement appeared to be unfairly discriminatory," without having done anything about it, and that therefore he, in his quasi-judicial capacity, under oath, said it "would be void." Neither did *any other Commissioner do anything about* this "void" rider, for 20 years until the 20th and "year of reckoning year," when the present Commissioner requested and obtained an Attorney General's opinion dated June 27, 1968. This opinion seems to have nothing to do with this case, although it heavily is relied on and is one of the bases for the company's unilateral conclusion and announcement to its policyholders that their endorsement contract was null and void. The opinion of the Attorney General is based on a statute passed in 1955,—seven years after the Bonus Fund endorsement was entered into, at which earlier time it was approved by the then Insurance Commissioner, and again, apparently approved by the Commissioner in the 1960 merger procedure,—by taking no action, and by the then Attorney General who appeared in the hearing and approved the merger. The Attorney General's opinion actually attempted to lay down a couple of new legal precedents, one approving the

renegation of the impairment of obligations clause of the Constitution, and the other declaring illegal, retroactively, a contract legal when executed, when it said that some other sections *and* the 1955 statute, *"read cumulatively,"* were part of an over-all statutory pattern of legislative intent to prohibit the issuance of such inducements and benefits such as the Bonus Fund Endorsement. The opinion talks about the cumulative statutes' purpose being *to prevent deceptive acts or practices,*—providing a penalty of revocation of authority or license of any *"insurer, general agent, agent, broker, or solicitor guilty of a violation of any such provision,"*—citing Replacement Vol. 4, U.C.A.1953, 31–27–16, 22, 23 (1966), and citing Utah Assn. v. Mountain St., 58 Utah 579, 200 P. 673 (1921). It is obvious that the opinion was talking about deceptive *insurers,—not insureds,*—and that the *insureds* (public) were to be protected against such deception and *not made parties to it,*—as defendants contend by citing Chap. 63, Laws of Utah *1947, 43–27–15, p. 276. This was a section which the Attorney General never mentioned.* The opinion was *based solely on a statute passed seven years after the policies were issued.* In error, the opinion did not treat the issues of impairment of contract or ex post facto considerations.

It seems almost obvious to us that defendants simply relied heavily on the conclusion of the Attorney General that the

endorsement was void (as did Andrew on the Insurance Commissioner's conclusion it was valid), without bothering to mention the reasoning of the opinion. It appears that the defendant simply used such opinion as an overture, but supplemented it with a statute apparently not considered before by defendant, its actuaries, insurance commissioners, or anyone else. This technique is somewhat disarming, when one considers that the whole thrust of the defendant's, actuaries', and commissioners' arguments, commentaries or implications was that the contract might be illegal,—not because of any statute,—but because it *discriminated for or against somebody*,—and there is nothing in the record to support such conclusion. It appears that defendant required a different crutch than the Attorney General's opinion, and it adopted another as weak,—the statute. That statute was a section in Chap. 63, Laws of Utah 1947, 43-27-15, p. 276. Defendants asterisk this section in their brief to a rather technical degree and then say that it condemns any person who buys an insurance policy as being particeps to an illegal scheme,—one who cannot recover under a contract's plain terms,—even if, as the facts here reflect, the purchaser neither solicits an insurance contract, has no intention of entering into an illegal or "conspiratorial" contract, is advised by the insurer that the contract is legal, is assured in writing by the top insurance man in the state,—the Insurance Commissioner,—that the endorsement is sound, solid and legal, pays his premiums religiously for the entire term of the contract without anyone, —Commissioner, or company,—saying one word, where the company accepts the premiums for the entire time, having the use thereof, while several Insurance Commissioners look on and nod their heads in approval.

It is difficult to buy that kind of equity.

■ ■ Chap. 63, Laws of Utah 1947, 43-27, appears to us to be a brake statute designed to slow down *insurers, not insureds*. It obviously is designed generally to protect the latter against the misrepresentations and deceptions of the former. The isolated Sec. 43-27-15 is no exception, although by straining language one could argue, as do the defendants, that the legislature intended that an innocent, honest, unsuspecting purchaser of an insurance policy across the kitchen table and at the unsolicited solicitation of an eager agent, becomes suspect. We think that taking the statute at face value, the defense that plaintiff, Andrew, for example, conspiratorially is an accomplice to illegality, would offend against the intention of the legislature. Also, we are of the opinion, without saying that solely it is dispositive here, that the rule of noscitur a sociis well may be applicable in excluding Mr. Andrew from the statute's language. Certainly, to hold

Andrew accountable for illegality under the facts of this case would cast serious constitutional doubts on the statute. Nonetheless, we are satisfied there was no legislative intention that an insured that does not seek out an insurer and has no intention of participating in an illegal act claimed by an insurer, after the latter has been paid in full for a matured policy according to its plain terms, shall be particeps criminis.

What is more, however, we conclude that the language of that statute necessarily does not condemn the provisions of the endorsement, except in the eyes of the beholder.

Defendants accepted the word of their actuaries and the Attorney General, whose reasoning did not justify the implied conclusion that the policy was invalid at its inception, while Mr. Andrew accepted the word of the company and the Insurance Commissioner. It seems almost obvious that the statute which defendants use to claim illegality, because of doubt and ambiguity, was corrected in 1955 by another, but not retroactive one, that was the cornerstone of the Attorney General's opinion. In pursuing the course the defendants pursued, in declaring their own policy void, without first consulting its policyholders, we think, presents a study in prematurity resulting in forcing its contractees into expensive litigation resulting in casting the burden of proof on them where the reverse might have been true had the company instituted clarifying litigation.

Two separate suits were consolidated here. In one an accounting was prayed. In the other specific performance was asked. The specific performance request invites us to shift to the equity side of the court. It would seem that the equitable thing to do is to remand this case for a factual determination of the issues. The parties should have an opportunity to try their cases, not by summary judgment because we believe there are facts here making summary judgment inappropriate. This author suggests that equity be with all, else most everyone in this case may lose his litigable shirt. The company here appears to be a sound and reputable one, trying to adjust the equities in a possible improvident part of a sales program designed by its predecessor to help the latter become established.

The case is remanded for a trial of the issues under the rules, with the hope that all concerned cooperate in strengthening the company and the best interests and security of all concerned, without resorting to protracted and costly litigation.

CALLISTER, C. J., concurs.

ELLETT, CROCKETT and TUCKETT, JJ., concur in the result.